## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br>Department of Justice<br>Antitrust Division<br>450 5th Street NW, Suite 8700<br>Washington, D.C. 20530 | CASE NO.: |
| Plaintiff | |
| v. | |
| BEMIS COMPANY, INC.,<br>One Neenah Center<br>Neenah, WI 54957 | |
| and | |
| RIO TINTO PLC,<br>2 Eastbourne Terrace<br>London<br>W2 6LG<br>United Kingdom | JUDGE: |
| and | |
| ALCAN CORPORATION,<br>8770 West Bryn Mawr Avenue<br>Chicago, IL 60631 | |
| Defendants. | |

## COMPLAINT

The United States of America ("United States"), acting under the direction of the

Attorney General, brings this civil antitrust action against defendants Bemis Company, Inc.

("Bemis"), Rio Tinto plc ("Rio Tinto"), and Alcan Corporation ("Alcan") to enjoin Bemis's

proposed acquisition from Rio Tinto of the Alcan Packaging Food Americas business and to obtain other equitable relief.  The United States complains and alleges as follows:

## I.    NATURE OF THIS ACTION

1.    Bemis announced that it has agreed to purchase the Alcan Packaging Food Americas business from Rio Tinto for $1.2 billion.

2.    Bemis and Alcan are the two leading suppliers in the United States and Canada of flexible packaging products suitable for a variety of natural cheese products packaged for retail sale.  Bemis and Alcan are also two of the three primary suppliers of shrink bags for fresh-meat packaging in the United States and Canada.

3.    The proposed acquisition would eliminate competition between Bemis and Alcan, which for some customers are the two best sources of flexible packaging for certain natural cheese products.  The proposed acquisition likely also would reduce competition substantially in the highly concentrated market for shrink bags for fresh-meat packaging.  As a result, the proposed acquisition likely would substantially lessen competition in the development, production, and sale of flexible packaging and associated services for chunk, sliced, and shredded natural cheese packaged for retail sale and for fresh meat in the United States and Canada in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.

## II.    THE DEFENDANTS

4.    Bemis is a Missouri corporation headquartered in Neenah, Wisconsin.  In 2008, Bemis and its subsidiaries had total sales of approximately $3.8 billion, including approximately

$2.1 billion of flexible packaging in the United States. Bemis's flexible packaging for cheese and meat is produced by its wholly owned, but separately incorporated, Curwood, Inc. division.

5.      Rio Tinto is organized under the laws of and headquartered in the United Kingdom. Its 2008 sales totaled approximately $58 billion. Rio Tinto acquired Alcan in 2007.

6.      Alcan is a wholly owned subsidiary of Rio Tinto. Alcan is a Delaware corporation headquartered in Chicago, Illinois. The Alcan Packaging Food Americas business produces and sells flexible packaging in the United States, Canada, and Latin America. In 2008, the Alcan Packaging Food Americas business sold approximately $1.5 billion of flexible packaging.

## III.     JURISDICTION AND VENUE

7.      The United States brings this action under Section 15 of the Clayton Act, 15 U.S.C. § 25, to prevent and restrain defendants from violating Section 7 of the Clayton Act, 15 U.S.C. § 18.

8.      Defendants themselves, or through wholly owned subsidiaries, produce and sell flexible packaging and associated services for natural cheese and fresh meat, among other products, in the flow of interstate commerce. Defendants' activities in the development, production, and sale of flexible packaging for natural cheese and fresh meat, among other products, substantially affect interstate commerce. This Court has subject-matter jurisdiction over this action pursuant to Section 15 of the Clayton Act, 15 U.S.C. § 25 and 28 U.S.C. §§ 1331, 1337(a) and 1345.

9.      Defendants have consented to venue and personal jurisdiction in the District of
Columbia.  Venue is therefore proper in this District under Section 12 of the Clayton Act, 15
U.S.C. § 22, and 28 U.S.C. § 1391(c).  Venue is also proper in the District of Columbia for
defendant Rio Tinto under 28 U.S.C. § 1391(d).

## IV.     BACKGROUND

### A.      The Flexible-Packaging Industry

10.     Flexible packaging is any package the shape of which can be readily changed.
Flexible packaging for food encompasses a wide range of products, including bags and
wrappings for cheeses and meats, snack bags, and cereal-box liners.  Flexible packaging is
distinguishable from rigid packaging, such as jars, cans, cups, trays, and hard plastic bottles.

11.     Varying degrees of design and manufacturing sophistication are required to
produce flexible packaging for different end uses.  Some flexible packaging, such as single-layer
packaging, is relatively simple to manufacture, and customers can choose from a number of
producers for these types of flexible packaging.  Flexible packaging for other end uses, such as
natural cheese and fresh meat, however, has multiple layers, is subject to more rigorous
performance standards, requires greater scientific knowledge and technical know-how to
engineer, and requires that technical support be readily available, and, therefore, is more difficult
to produce and commercialize successfully.

### B.      Procurement of Flexible Packaging for Natural Cheese and Fresh Meat

12.     Producers of flexible packaging sell their packaging to producers of food that
package their products for wholesale or retail sale.  Customers typically have particular and

unique specifications for their packaging. For example, customers use flexible packaging to differentiate their products from those of their rivals. Moreover, customers have different packaging equipment, and the flexible packaging must be specifically qualified to run on the particular customer's equipment.

13.     Producers of flexible packaging must work closely with customers to ensure that their packaging material runs efficiently on their customers' machines, that they meet the promised lead times, and that they continuously find ways to cut the customer's costs. Producers must also engage in research and development to deliver better packaging products in order to compete effectively.

14.     Customers of flexible packaging for certain forms of natural cheese and fresh meat can incur substantial costs to switch between different flexible-packaging producers. These costs result, in part, from having to modify existing packaging equipment to make it compatible with the new producer's films and the downtime associated with that modification. Customers also incur costs from testing and qualifying a new supplier.

15.     Prices for flexible packaging for natural cheese and fresh meat are customer-specific and based on, among other things, an individual customer's unique requirements. The price charged to one customer likely will be different from the price charged to another customer.

16.     Price competition in the relevant markets occurs in two ways. First, customers may issue a request for proposal, through which they invite potential suppliers to bid on supplying packaging that meets the customers' specifications. Customers evaluate the competing bids on the basis of, among other things, compliance with their specifications, price, delivery

times, and the services provided by each producer.  Second, price competition may also occur

less formally if a customer seeks or receives an offer from an alternative supplier and the

incumbent is given a chance to respond.

## V.    RELEVANT PRODUCT MARKETS

### A.    Product Markets for Natural-Cheese Packaging

17.    Natural cheese is sold in several different forms, including chunk cheese, sliced

cheese, and shredded cheese.

18.    The films used in flexible packaging for some natural-cheese products are sold in

the form of rollstock, which is a continuous sheet of film that is cut for each package.  Most

natural cheese sold at retail is packaged using rollstock films.  The particular flexible-packaging

rollstock and the services associated with providing it to customers ("flexible-packaging

rollstock") used for: (a) chunk and sliced natural cheese packaged for retail sale; and (b)

shredded natural cheese packaged for retail sale are distinct product markets.

19.    Cheese-packaging customers demand a long shelf-life for natural cheese.  The

flexible-packaging rollstock for natural cheese must include a barrier layer that keeps out oxygen

to prevent the cheese from spoiling.  The packaging also must prevent moisture from leaking into

or out of the package.  Some cheeses emit gasses as they age; such cheeses require packaging that

allows gasses to escape.  In addition, the packaging film must be sufficiently transparent to

present the cheese well to the consumer, but also avoid discoloration from fluorescent lights.

The packaging also must resist abrasion and cracking during distribution and run smoothly and

efficiently on the customer's filling machines.  Finally, the packaging must be inert, so that the flavor of the cheese is not compromised by the plastic.

### 1.    Flexible-Packaging Rollstock for Chunk and Sliced Natural Cheese Packaged for Retail Sale Is a Relevant Product Market.

20.    Chunk natural cheese is sold in bricks of specific sizes, typically eight, but ranging to thirty-two, ounces.  Sliced natural cheese is typically sold in packages with roughly ten or more slices.  Producers of chunk and sliced natural cheese generally use the same films for packaging.

21.    Specialized rollstock films are designed specifically for packaging chunk and sliced natural cheese for retail sale.  While some chunk and sliced natural cheeses for retail sale are packaged in other forms of packaging (e.g., shrink bags or rigid trays), these are more expensive to purchase than rollstock packaging and cannot be used on the same packaging equipment as rollstock.  A small but significant increase in the price of flexible-packaging rollstock for chunk and sliced natural cheese packaged for retail sale likely would not cause customers faced with such an increase to substitute to other forms of packaging, or otherwise purchase sufficiently less of that product, so as to render the price increase unprofitable.

22.    Therefore, flexible-packaging rollstock for chunk and sliced natural cheese packaged for retail sale is a line of commerce and a relevant product market within the meaning of Section 7 of the Clayton Act.  In 2008, approximately $100 million in sales of this product were made in the United States and Canada.

7

2.      **Flexible-Packaging Rollstock for Shredded Natural Cheese Packaged for Retail Sale Is a Relevant Product Market.**

23.     Shredded natural cheese packaged for retail sale typically is packaged in bags, which often come with an easy-open mechanism and an easy-close attachment.  The easy-open mechanism is either laser-scored or mechanically scored, such that some of the package's layers are perforated (making the package easy to tear), while leaving the oxygen and moisture barriers intact (preventing contamination of the product).  The scoring process presents significant challenges to flexible-packaging producers.  The sealing process also is difficult because the bags typically are filled with cheese while in a vertical position and the release of cheese into the bags is continuous and fast.

24.     Specialized films are designed specifically for shredded natural cheese packaged for retail sale.  A small but significant increase in the price of flexible-packaging rollstock for shredded natural cheese packaged for retail sale likely would not cause customers faced with such an increase to substitute to other forms of packaging, or otherwise purchase sufficiently less of that product, so as to render the price increase unprofitable.

25.     Therefore, flexible-packaging rollstock for shredded natural cheese packaged for retail sale is a line of commerce and a relevant product market within the meaning of Section 7 of the Clayton Act.  In 2008, approximately $100 million in sales of this product were made in the United States.

8

**B.    Flexible-Packaging Shrink Bags for Fresh Meat Are a Relevant Product Market.**

26.    Certain characteristics are common to most flexible-packaging films for fresh meat (i.e., beef, veal, pork, and lamb).  First, most films for fresh meat contain a layer that prevents oxygen from coming into contact with the meat.  Second, fresh meat films must prevent moisture from leaking out and contaminants from entering the packaging.  Third, fresh meat films must run effectively on the customer's packaging equipment.  Finally, the sealant must bond through fatty and oily substances.

27.    The most common type of flexible-packaging film for fresh meat is a shrink bag, which is designed to shrink to the contours of the contents when heated, forming a tight seal. Shrink bags are particularly suitable for use with fresh meat, in particular for wholesale distribution of meat to be cut for retail sale in grocery stores.  Shrink bags and the services associated with providing them to customers ("flexible-packaging shrink bags") used for fresh meat constitute a distinct product market. The shrink bag must be durable to survive distribution while maintaining its oxygen and moisture barriers and allowing the meat to retain its flavor. The bag also must meet shelf-life requirements of 30 days or more and, when used for retail packaging, have a high degree of transparency for optimal presentation.

28.    A small but significant increase in the price of flexible-packaging shrink bags for fresh meat likely would not cause customers faced with such an increase to substitute to other forms of packaging, or otherwise purchase sufficiently less of that product, so as to render the price increase unprofitable.

29.     Therefore, flexible-packaging shrink bags for fresh meat constitute a line of commerce and a relevant product market within the meaning of Section 7 of the Clayton Act.  In 2008, approximately $800 million in sales of this product were made in the United States.

**C.     The United States and Canada is a Relevant Geographic Market.**

30.     Producers of flexible-packaging rollstock for chunk, sliced, and shredded natural cheese packaged for retail sale and flexible-packaging shrink bags for fresh meat ship the packaging to customers throughout the United States and Canada.  Producers outside the United States and Canada are not good alternatives for customers in the United States and Canada. Customers using producers outside the United States and Canada would face longer lead times and an increased potential for supply-chain complications.  Moreover, major customers demand that producers of flexible packaging provide frequent technical and operational service and support at the customer's premises and do not believe that foreign suppliers can provide the level of service and support they demand.  A small but significant increase in the price of flexible-packaging rollstock for chunk, sliced, and shredded natural cheese packaged for retail sale and flexible-packaging shrink bags for fresh meat in the United States and Canada likely would not cause customers in the United States and Canada to turn to producers outside the United States and Canada in sufficient numbers so as to render such a price increase unprofitable.

31.     Accordingly, the United States and Canada is a relevant geographic market for flexible-packaging rollstock for chunk, sliced, and shredded natural cheese packaged for retail sale and flexible-packaging shrink bags for fresh meat within the meaning of Section 7 of the Clayton Act.

## VI.    THE PROPOSED ACQUISITION'S LIKELY ANTICOMPETITIVE EFFECTS

### A.    Likely Anticompetitive Effects in the United States and Canada for Flexible-Packaging Rollstock for Chunk and Sliced Natural Cheese Packaged for Retail Sale

32.    Based on their capabilities and sales history, Bemis and Alcan are two of only a few competitors that might successfully bid to supply a customer with flexible-packaging rollstock for chunk and sliced natural cheese packaged for retail sale. Currently, Bemis and Alcan account for approximately 37 and 54 percent, respectively, of sales in the United States and Canada for this product. If the proposed acquisition is not enjoined, Bemis and Alcan combined would account for approximately 91 percent of sales in the United States and Canada for this product. Using a measure of market concentration called the Herfindahl-Hirschman Index ("HHI") (explained in Appendix A), the HHI would increase by more than 3,900 points, resulting in a post-acquisition HHI of more than 8,000 points.

33.    Market shares are best measured using revenues in the markets for the Relevant Products because suppliers with the capacity to produce similar goods outside of those markets cannot quickly and easily shift that capacity to supply customers with the Relevant Products. Thus, the mere possession of similar capacity does not make a supplier an "uncommitted entrant"; meeting the requirements of customers in a cost-efficient manner also requires specialized know-how, experience, qualification, and the ability to innovate.

34.    Due to Bemis's and Alcan's collective overall expertise in meeting the needs of customers and other technical and commercial factors for flexible-packaging rollstock for chunk and sliced natural cheese packaged for retail sale, including, among other things, price, delivery

times, service, and technical support, Bemis and Alcan frequently are perceived by each other, by other bidders, and by customers as being the two strongest competitors in that market.

35.     Bemis's bidding behavior often has been constrained by the possibility of losing business to Alcan. By eliminating Alcan, Bemis would gain the incentive and likely ability to profitably increase its bid prices higher than it otherwise would without the acquisition. Customers have also benefitted from competition between Bemis and Alcan through higher quality, better supply-chain options (including delivery times and volume-purchase requirements), technical support, and numerous innovations. The combination of Bemis and Alcan would eliminate this other competition and future benefits to the customers.

36.     The proposed acquisition, therefore, likely would substantially lessen competition in the United States and Canada for flexible-packaging rollstock for chunk and sliced natural cheese packaged for retail sale, which likely would lead to higher prices, lower quality, less favorable supply-chain options, reduced technical support, and less innovation, in violation of Section 7 of the Clayton Act.

**B.     Likely Anticompetitive Effects in the United States and Canada for Flexible-Packaging Rollstock for Shredded Natural Cheese Packaged for Retail Sale**

37.     Based on their capabilities and sales history, Bemis and Alcan are two of only a few credible competitors that might successfully bid to supply a customer with flexible packaging rollstock for shredded natural cheese packaged for retail sale. Currently, Bemis and Alcan account for approximately 27 and 49 percent, respectively, of sales in the United States and Canada for this product. If the proposed acquisition is not enjoined, Bemis and Alcan combined would account for approximately 76 percent of sales in the United States and Canada

for this product. The HHI would increase by approximately 2,500 points, resulting in a post-acquisition HHI of more than 5,600 points.

38.     Market shares are best measured using revenues in the markets for the Relevant Products because suppliers with the capacity to produce similar goods outside of those markets cannot quickly and easily shift that capacity to supply customers with the Relevant Products. Thus, the mere possession of similar capacity does not make a supplier an "uncommitted entrant"; meeting the requirements of customers in a cost-efficient manner also requires specialized know-how, experience, qualification, and the ability to innovate.

39.     Due to Bemis's and Alcan's collective overall expertise in meeting the needs of customers and other technical and commercial factors for flexible-packaging rollstock for shredded natural cheese packaged for retail sale, including, among other things, price, delivery times, service, and technical support, Bemis and Alcan frequently are perceived by each other, by other bidders, and by customers as being the two strongest competitors in that market.

40.     Bemis's bidding behavior often has been constrained by the possibility of losing business to Alcan.  By eliminating Alcan, Bemis would gain the incentive and ability to profitably increase its bid prices higher than it otherwise would without the acquisition. Customers have also benefitted from competition between Bemis and Alcan through higher quality, better supply-chain options, better technical support, and numerous innovations.  The combination of Bemis and Alcan would eliminate this other competition and future benefits to the customers.

41.     The proposed acquisition, therefore, likely would substantially lessen competition in the United States and Canada for flexible-packaging rollstock for shredded natural cheese packaged for retail sale, which likely would lead to higher prices, lower quality, less favorable supply-chain options, reduced technical support, and less innovation, in violation of Section 7 of the Clayton Act.

C.     **Likely Anticompetitive Effects in the United States and Canada for Flexible-Packaging Shrink Bags for Fresh Meat**

42.     Currently, Bemis and Alcan account for approximately 20 and 8 percent, respectively, of the sales in the United States and Canada for flexible-packaging shrink bags for fresh meat.  If the proposed acquisition is not enjoined, Bemis and Alcan combined would account for approximately 28 percent of sales of flexible-packaging shrink bags for fresh meat in the United States and Canada, and leave Bemis and one other firm with approximately 93 percent of sales.   The HHI would increase by more than 300 points, resulting in a post-acquisition HHI of more than 5,000 points.

43.     Market shares are best measured using revenues in the markets for the Relevant Products because suppliers with the capacity to produce similar goods outside of those markets cannot quickly and easily shift that capacity to supply customers with the Relevant Products. Thus, the mere possession of similar capacity does not make a supplier an "uncommitted entrant"; meeting the requirements of customers in a cost-efficient manner also requires specialized know-how, experience, qualification, and the ability to innovate.

44.     Although the third supplier of flexible-packaging shrink bags for fresh meat is the dominant supplier, some customers desire two or more suppliers.  As a result, Bemis and Alcan

14

often find themselves competing to be the second supplier, and their price competition exerts

pricing pressure also on the dominant firm. Unless the proposed acquisition is enjoined, that

bidding dynamic would be eliminated because Bemis and Alcan no longer would bid against one

another. In addition, Bemis's elimination of Alcan as an independent competitor would result in

only two suppliers accounting for nearly all of the market. Such an increase in concentration

likely would make coordination easier.

45. The proposed acquisition, therefore, likely would substantially lessen competition

in the United States and Canada for flexible-packaging shrink bags for fresh meat, which likely

would lead to higher prices, lower quality, less favorable supply-chain options, reduced technical

support, and less innovation, in violation of Section 7 of the Clayton Act.

**D.    Entry Is Unlikely to Prevent Anticompetitive Harm**

46. Some customers in the United States and Canada have attempted to procure

suitable flexible-packaging rollstock for chunk, sliced, and shredded natural cheese packaged for

retail sale from producers that do not currently produce packaging for these uses. Similarly,

some customers in the United States and Canada have attempted to procure suitable flexible-

packaging shrink bags for fresh meat from producers beyond Bemis and Alcan and the dominant

producer. Most of those flexible-packaging producers have not been able cost-effectively to

achieve the required specifications or quality requirements. These suppliers likely would not be

able to meet customers' required specifications or quality requirements cost-effectively within a

commercially reasonable period of time, nor would they likely be able to produce products that

would run efficiently on their customers' packaging equipment.

47.     New entry into the markets for flexible-packaging rollstock for chunk and sliced natural cheese packaged for retail sale, flexible-packaging rollstock for shredded natural cheese packaged for retail sale, and flexible-packaging shrink bags for fresh meat in the United States and Canada would be costly, difficult, and time consuming. A new supplier would need to construct production lines capable of producing films that meet the rigorous standards set forth by major buyers of such films. Construction of manufacturing facilities would require millions of dollars of capital investment and the entrant would have to be committed to research and development. In addition, the technical know-how necessary to design and successfully manufacture packaging that is able to run efficiently on customers' equipment cost-effectively is difficult to obtain.

48.     Even after a new entrant has developed the capability to supply flexible-packaging rollstock for chunk, sliced, and shredded natural cheese packaged for retail sale and flexible-packaging shrink bags for fresh meat, the entrant must be qualified by potential customers, demonstrating that it is capable of manufacturing products that meet rigorous quality and performance standards. For example, because the qualifying process for natural cheese typically requires a shelf-life test, where sample products are wrapped in the candidate packaging and stored in retail-like conditions for extended periods of time, the process can take many months. Further, there is no guarantee that the attempted qualification will be successful, and the entrant may have to repeat the process multiple times. In such cases, the qualification process can take multiple years with no guarantee of success. Moreover, because customer specifications are unique, qualification with one customer does not guarantee qualification with another.

49.     Entry of existing packaging firms is unlikely because the technical know how necessary to create the packaging for the relevant products is difficult to obtain.  Also, a company would have to pass each customer's rigorous qualification tests.  Entry of existing packaging firms into the markets for flexible-packaging rollstock for chunk and sliced natural cheese packaged for retail sale, flexible-packaging rollstock for shredded natural cheese packaged for retail sale, and flexible-packaging shrink bags for fresh meat, therefore, likely would not be timely, likely, and sufficient to defeat a small but significant increase in price in the relevant markets.

50.     As a result of these barriers, entry by new firms or by existing packaging firms likely would not be timely, likely, and sufficient to prevent a likely exercise of market power by Bemis after the acquisition.

## VII.    THE PROPOSED ACQUISITION
## VIOLATES SECTION 7 OF THE CLAYTON ACT

51.     Bemis's proposed acquisition of the Alcan Packaging Food Americas business would be likely to substantially lessen competition in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18, in the United States and Canada for:  (1) flexible-packaging rollstock for chunk and sliced natural cheese packaged for retail sale; (2) flexible-packaging rollstock for shredded natural cheese packaged for retail sale; and (3) flexible-packaging shrink bags for fresh meat.

52.     Unless enjoined, the proposed acquisition likely would have the following anticompetitive effects, among others:

(a)     actual and potential competition between Bemis and Alcan in the relevant markets would be eliminated;

17

(b)     competition in the relevant markets likely would be substantially lessened;

and

(c)     for the relevant products, prices would likely increase, quality would likely decrease, supply-chain options would likely be less favorable, technical support would likely be reduced, and innovation would likely decline.

## VIII.   REQUESTED RELIEF

53.     The United States requests that this Court:

(a)     adjudge and decree Bemis's proposed acquisition of the Alcan Packaging Food Americas business to violate Section 7 of the Clayton Act, 15 U.S.C. § 18;

(b)     enjoin defendants and all persons acting on their behalf from consummating the proposed acquisition of the Alcan Packaging Food Americas business by Bemis, or from entering into or carrying out any other agreement, plan, or understanding the effect of which would be to combine Bemis with the Alcan Packaging Food Americas business;

(c)     award the United States its costs for this action; and

(d)     award the United States such other and further relief as the Court deems just and proper.

FOR PLAINTIFF UNITED STATES OF AMERICA:

Christine A. Varney
Assistant Attorney General
D.C. Bar # 411654

Maribeth Petrizzi
Chief, Litigation II Section
D.C. Bar # 435204

18

William F. Cavanaugh, Jr.
Deputy Assistant Attorney General

Dorothy B. Fountain
Assistant Chief, Litigation II Section
D.C. Bar # 439469

J. Robert Kramer II
Director of Operations

Rachel Adcox
Attorney
United States Department of Justice
Antitrust Division
450 Fifth Street NW, Suite 8700
Washington, D.C.  20530
(202) 307-0924

Dated: February 24, 2010

APPENDIX A
DEFINITION OF HHI

The term "HHI" means the Herfindahl-Hirschman Index, a commonly accepted measure of market concentration. The HHI is calculated by squaring the market share of each firm competing in the market and then summing the resulting numbers.  For example, for a market consisting of four firms with shares of 30, 30, 20, and 20%, the HHI is 2,600 ($30^2 + 30^2 + 20^2 + 20^2 = 2,600$).  The HHI takes into account the relative size distribution of the firms in a market.  It approaches zero when a market is occupied by a large number of firms of relatively equal size and reaches its maximum of 10,000 points when a market is controlled by a single firm.  The HHI increases both as the number of firms in the market decreases and as the disparity in size between those firms increases.

Markets in which the HHI is between 1,000 and 1,800 points are considered to be moderately concentrated, and markets in which the HHI is in excess of 1,800 points are considered to be highly concentrated.  *See Horizontal Merger Guidelines* ¶ 1.51 (revised Apr. 8, 1997).  Transactions that increase the HHI by more than 100 points in highly concentrated markets presumptively raise antitrust concerns under the *Horizontal Merger Guidelines* issued by the Department of Justice and the Federal Trade Commission.  *See id.*